IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PACIFIC EMPLOYERS INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 09-5211 |
| | : | |
| AXA BELGIUM S.A. f/k/a ROYALE BELGE INCENDIE REASSURANCE, Defendant. | : | |
| | : | |

Goldberg, J.                                                    April 27, 2011

## MEMORANDUM OPINION

The dispute between the parties in this case involves an alleged breach of a reinsurance contract. Before the Court is Defendant's motion to dismiss Plaintiff's complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, under the doctrine of *forum non conveniens*. For the reasons set forth below, I will grant Defendant's motion.

## I.      BACKGROUND

### A.      Facts Pertinent to Jurisdiction

Plaintiff, Pacific Employers Insurance Company (PEIC), is a Pennsylvania company whose current principal place of business is in Philadelphia, Pennsylvania. As will be detailed below, PEIC's previous place of business was Los Angeles, California. (Pl.'s Mem. 1.)[1] Defendant, AXA Belgium, S.A. (AXA Belgium), is an insurer and reinsurer organized under the laws of the Kingdom

---

[1] Defendant's Memorandum of Law in Support of its Motion to Dismiss will be cited to as "Def.'s Mem." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss will be cited to as "Pl.'s Mem."

1

of Belgium with office headquarters located in Brussels, Belgium. (Def.'s Mem. 5.)

The business relationship between the parties began in 1978 when PEIC and AXA Belgium entered into a reinsurance agreement referred to as the Quota Share Agreement. At the time this agreement was negotiated and entered into, PEIC was a California domiciled insurance company with its principal place of business in California.[2] (Pl.'s Mem. 1.) PEIC's managing general agent, Montgomery and Collins, Inc. (M&C), who negotiated the Quota Share Agreement on PEIC's behalf, was also located in California. (Def.'s Mem. 1.) PEIC alleges that under this agreement, AXA Belgium was obligated to reimburse PEIC for 5% of a portion of loss and/or loss expense payments made with respect to insurance policies written by M&C on PEIC's behalf (the Reinsured Policies). (Pl.'s Mem. 2.) While in force, all dealings under the Quota Share Agreement, including underwriting, took place through correspondence between AXA Belgium in Brussels and M&C, acting as PEIC's agent, in California. (Def.'s Mem. 7.) The Quota Share Agreement did not in any way limit the geographic scope of the Reinsured Policies. (Pl.'s Mem. 2.)

The terms of the Quota Share Agreement were never formalized into a written reinsurance agreement. Consequently, the parties never agreed to terms regarding exclusive jurisdiction in the event of a legal dispute nor did they agree on service of suit, choice of law, forum selection or arbitration. (Def.'s Mem. 7.)

AXA Belgium terminated its participation under the Quota Share Agreement effective January 31, 1985. However, PEIC has alleged that AXA Belgium's rights and obligations did not end at that time, and that AXA remains liable to reimburse PEIC for a portion of PEIC's loss and loss expense payments with respect to the Reinsured Policies written by M&C during the life of the

---

[2] PEIC was also authorized as an insurer in Belgium. (Def.'s Mem. 5.)

2

Quota Share Agreement. Indeed, PEIC claims that AXA Belgium's obligations to reimburse PEIC continue to this day and will continue into the future. (Pl.'s Mem. 2.)

The facts offered by PEIC in support of jurisdiction in this district are wide ranging and extend over a lengthy time period. PEIC acknowledges that prior to 1992/1993, reinsurance reporting, billing and collection under the Quota Share Agreement was handled on their behalf by personnel in California through CIGNA, who had acquired PEIC.[3] However, PEIC notes that after 1992/1993, responsibility for handling direct claims under the Reinsured Policies and the reinsurance reporting, billing and collection under the Quota Share Agreement was transferred from California to CIGNA personnel in Philadelphia. Consequently, PEIC stresses that since 1992/1993, all of PEIC's billings to AXA Belgium have been sent from Philadelphia and all payments have been made to Philadelphia. (Pl.'s Mem. 2-3.) In 1996, PEIC re-domesticated to Pennsylvania, where it is presently incorporated. (Def.'s Mem. 5.) AXA Belgium does not dispute these facts but points out that it only made a total of thirty-one claim payments to PEIC in Pennsylvania between 1992 and 2007. (Declaration of Beverly McClure.)[4]

---

[3] CIGNA was formed in 1982 when The Insurance Company of North America (INA) merged with Connecticut General Life Insurance Company. PEIC, which had been a member of the INA group of companies became a member of CIGNA group of companies. In 1999, ACE Limited acquired CIGNA's property and casualty operations. Following the acquisition, PEIC became a member of the ACE group of companies. (Def.'s Mem. 3 n. 1; Caprice Aff., ¶ 5.)

[4] On March 11, 2011, the Court requested that the parties point to facts of record regarding the number of claim payments AXA Belgium made to PEIC in Philadelphia between 1992 and 2007. PEIC responded citing to Exhibit J attached to their Supplemental Memorandum of Law (doc. no. 32). PEIC highlighted three payments totaling $306,604.75 which it believed related to the contract at issue. PEIC also cited to a fourth payment in the amount of $420,697.92 made in 2007. (Caprice Aff. ¶ 10.)
AXA Belgium responded by submitting the Declaration of Beverly McClure which indicated thirty-one payments were made from AXA Belgium to PEIC in Philadelphia between 1992 and 2007.

PEIC also alleges that "representatives" of AXA Belgium conducted audits of its files in Philadelphia on two occasions. The first audit was performed by Chiltington International Inc.[5] in 2004 and the second by AXA Liabilities Managers, Inc. (AXA LM Inc.)[6] in 2008. (Pl.'s Mem. 3; Caprice Aff. ¶¶ 21, 22.) PEIC points out that AXA Belgium personnel in Brussels, as well as AXA LM Inc. personnel in New York, allegedly working on AXA Belgium's behalf, have directed "numerous" written communications and made telephone calls to representatives of PEIC in Pennsylvania regarding the Quota Share Agreement. (Pl.'s Mem. 3.) However, no other details regarding these communications have been provided. According to PEIC, there was "at least one" in person meeting in Philadelphia in 2007 that an employee of AXA LM Inc. attended on behalf of AXA Belgium. (Caprice Aff. ¶ 23.)[7]

In addition to contacts with Pennsylvania which occurred pursuant to the Quota Share Agreement, PEIC details other business transactions entered into by AXA Belgium which allegedly

---

[5] Chiltington International Inc. is a corporation organized under the laws of the United Kingdom with offices in the state of New Jersey. It has no corporate affiliation with AXA Belgium. According to AXA Belgium, Chiltington conducted an inspection of PEIC's records to verify calculations made on PEIC's billings and to identify billing errors. (Def.'s Mem. 11-12.).

[6] AXA LM Inc. was incorporated under the laws of the state of Delaware in 2003 and maintains its principal offices in New York, New York. AXA Belgium and AXA LM Inc. have the same parent company, AXA, which is headquartered in Paris, France. (Def.'s Mem. 6.)

[7] PEIC states in its memorandum in opposition to AXA Belgium's motion to dismiss that representatives of PEIC and AXA Belgium met in Philadelphia on at least three occasions in 2007. (Pl.'s Mem. 3-4.) However, the affidavit of Joanne Caprice, cited to in support of this proposition, states that she "personally attended at least one meeting in 2007 at which various issues between AXA companies and ACE companies were discussed, including balances due under the Quota Share Agreement." She stated that Will Fawcett, an employee of AXA LM Inc., attended on behalf of AXA Belgium. (Caprice Aff. ¶ 23, 37.) (Joanne Caprice is a Senior Vice-President of Reinsurance at Resolute Management, Inc., a service company that manages claims-handling for PEIC, including the claims against AXA Belgium that are the subject of this suit. (Caprice Aff. ¶¶ 1-2.))

establish jurisdiction. For instance, PEIC points to AXA Belgium's general agency agreement through M&C whereby AXA Belgium authorized M&C to write insurance and reinsurance (excess and surplus line insurance) in the United States on AXA Belgium's behalf (MGA Agreement). (Pl.'s Mem. 4.)[8] PEIC was unable to obtain complete information on the number of policies M&C issued on behalf of AXA Belgium to Pennsylvania insureds. However, relying on a document which lists the policies issued pursuant to the MGA Agreement, PEIC asserts that AXA Belgium issued more than 40 policies through M&C's affiliate in Philadelphia. (Pl.'s Mem. 4.)[9]

PEIC also asserts that in addition to contracts under the MGA Agreement, AXA Belgium entered into a significant number of reinsurance agreements with various insurers in Pennsylvania, including affiliates of PEIC and the ACE group of companies. The document produced by PEIC in support of this contention includes a thirty page list of reinsurance contracts with contract effective dates spanning from 1977 through 1991 and termination dates spanning from 1977 through 1992. (Pl.'s Ex. 1.) Additionally, PEIC notes that AXA Belgium participated in a number of retrocessional contracts (reinsurance company purchases reinsurance) with INA and INA Reinsurance Company, both of which are Pennsylvania companies. (Caprice Aff. ¶ 28.)[10]

---

[8] The Agreement was entered into in 1978 and contains provisions which state that the Agreement is subject to the laws of California and in the case of a dispute, the parties consent to arbitration in Los Angeles, California. (Pl.'s Ex. 4.)

[9] This document does not identify the location of the insured, but does identify the M&C office through which the policies were issued. The document identified more than forty policies issued through the M&C office designated by a "P," which PEIC believes referred to the M&C office in Pennsylvania. (Caprice Aff. ¶ 33.)

[10] If the Court is properly construing the document cited to, AXA Belgium entered into 38 contracts with INA and INA Reinsurance Company between 1982 and 1992. (Caprice Aff. ¶ 28 ("the last two pages of the list referenced in paragraph 25 above [Exhibit 1] identify the retrocessional contracts between INA and INA Re")).

All tolled, PEIC claims that in connection with the above referenced insurance and reinsurance contracts, AXA Belgium had "pervasive" contacts, including emails, letters, telephone calls, audits and in person meetings with the representatives of Pennsylvania companies in connection with the MGA Agreement and the reinsurance contracts. (Pl.'s Mem. 4-5.) PEIC further points out that because the reinsurance contracts cover casualty risk, AXA Belgium's obligations under these contracts are long term. (Pl.'s Mem. 11.)

PEIC also stresses that as a result of the obligations stemming from these insurance and reinsurance agreements, AXA Belgium made 74 separate insurance and reinsurance payments in Pennsylvania between January 8, 2001 and September 22, 2010. These payments total $7,182,749.05 (reinsurance claims) and €1,703.88 (direct insurance claims). (Pl.'s Supp. Mem. 2.)

Finally, according to PEIC, the Annual Statements of AXA Belgium's Pennsylvania reinsureds for the year ending December 1, 2008, reflect "reinsurance recoverables" from AXA Belgium totaling nearly $10 million. The reinsurance recoverables, which are the amount of an insurer's incurred losses that will be paid by reinsurers,[11] include paid losses - the portion of incurred losses actually paid out by the insurer[12] - as well as reserves. If those reserves ultimately become paid losses, PEIC asserts that AXA Belgium could pay another $10 million to Pennsylvania reinsureds in the future. According to PEIC, this demonstrates that AXA Belgium's claim activity

---

[11] Definition found at http://www.irmi.com/online/insurance-glossary/terms/r/reinsurance- recoverable.aspx

[12] Definition found at http://www.irmi.com/online/insurance-glossary/terms/p/paid-losses.aspx

in Pennsylvania will continue into the future. (Pl.'s Supp. Mem. 2.)[13]

In response to all of this data, AXA Belgium notes that its total amount of claims paid between 2000 and 2009, was over 47.5 billion Euros ($63.6 billion) and the total amount of reserves set by AXA Belgium for 2008 were over 6.1 billion Euros ($8.1 billion). Therefore, the $7.5 million in paid claims in Pennsylvania over the past 10 years that PEIC relies upon, makes up only .026% of AXA Belgium's total claims paid.[14] Additionally, AXA Belgium stresses that the $10 million in alleged reserves for Pennsylvania is only 0.123% of its total reserves. (Def.'s Resp. to Pl's Supp. Mem. 7-8.)

B    Procedural History

PEIC filed its complaint in this district on November 9, 2009, alleging breach of contract and

---

[13] PEIC also argues that the information provided in discovery failed to identify all of AXA Belgium's claim activity in Pennsylvania. PEIC points to the spreadsheet of activity provided by AXA Belgium which only identifies payments actually made in Pennsylvania, not to Pennsylvania insureds and reinsureds. PEIC also alleges that the spreadsheet does not identify reserves, letters of credit or other activity such as claim communications, meetings, calls, or audits. (Pl.'s Supp. Mem. 2-3.)
AXA Belgium responds that this Court's September 30, 2010 Order allowing for jurisdictional discovery only required information on claim activity "occurring in Pennsylvania" and that claim payments made to a company that maintains its administrative offices outside of Pennsylvania would not qualify as activity occurring in Pennsylvania. (Def.'s Supp. Mem. 4-5.) AXA Belgium contends that its reserves are not claim activity occurring in Pennsylvania, because it sets its reserves with respect to claims at its home office in Belgium. Further, AXA Belgium notes that letters of credit do not constitute claim activity as they are standby instruments used to satisfy regulators in a jurisdiction that an insurer has sufficient collateral from an unauthorized foreign or alien reinsurer. AXA Belgium did not have an obligation to establish a letter of credit for PEIC and did not do so. Lastly, AXA Belgium asserts that any claims communications, meetings and calls concerning claim payments listed on AXA Belgium's spreadsheets occurred through brokers outside of Pennsylvania. (Def.'s Supp. Resp. 4-7.) All of this additional data has been considered by the Court.

[14] This fraction of a percent would reduce to .003% if the court were to consider claims going back three years; .005% if the court were to consider claims going back five years; and .011 going back seven years. (Def.'s Resp. to Pl's Supp. Mem. 8, n. 7.)

seeking declaratory relief. The lawsuit generally involves AXA Belgium's alleged refusal to pay claims under the Quota Share Agreement. On January 13, 2010, AXA Belgium filed the motion at issue, seeking dismissal of the complaint based upon a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, based on the doctrine of *forum non conveniens*. On March 5, 2010, PEIC filed a motion for expedited discovery, which was granted on September 30, 2010. On November 30, 2010, PEIC filed a supplemental memorandum of law in opposition to Defendant's motion to dismiss addressing the additional evidence produced in discovery. On December 28, 2010, AXA Belgium responded with a supplemental memorandum of law. AXA Belgium's motion is now ripe for decision.

## II.   APPLICABLE LAW

### A.   Rule 12(b)(2) Standard

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a matter where the court lacks personal jurisdiction. Where a defendant raises a jurisdictional defense, the plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction. Assonov v. Gholson, Hicks & Nichols, P.A., 209 Fed.Appx. 139, 141 (3d Cir. 2006) (citing Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987)). However, unless there is an evidentiary hearing, a plaintiff need only establish a *prima facie* case of personal jurisdiction. Further, a plaintiff is entitled to have his allegations taken as true and all factual disputes drawn in his favor. O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (quoting Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)).

B.    Personal Jurisdiction

"A federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." Provident Nat'l, 819 F.2d at 436 (citing Fed. R. Civ. P. 4(e)). Pennsylvania's long arm statute authorizes Pennsylvania courts to exercise personal jurisdiction over nonresidents to the "fullest extent allowed under the Constitution of the United States." 42 Pa.C.S. § 5322(b). The due process clause of the United States Constitution permits personal jurisdiction so long as the nonresident defendant has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

A plaintiff can meet this burden by establishing either general or specific jurisdiction over the defendant. Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001). General jurisdiction is proper where a defendant's contacts with the forum state are "continuous and systematic" and exists whether or not the cause of action is related to a defendant's activities in the forum state. Id. Specific jurisdiction arises from a defendant's activities in the forum state that relate to the particular cause of action being litigated. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985). Here, PEIC alleges that jurisdiction exists under both standards which I will consider in turn.

III.    DISCUSSION

A.    General Jurisdiction

General jurisdiction may be asserted "regardless of whether the subject matter of the cause of action has any connection to the forum." Pennzoil Products Co. v. Colelli & Assoc., Inc., 149 F.3d 197, 199 (3d Cir.1998)(quotations omitted). "To obtain general jurisdiction over a corporation in Pennsylvania, the corporation must either: (1) be incorporated in Pennsylvania or licensed as a

9

foreign corporation in the Commonwealth, (2) consent to jurisdiction, or (3) carry on a 'continuous and systematic part of its general business' within the Commonwealth." Endless Pools, Inc. v. Wave Tec Pools, Inc., 362 F.Supp.2d 578, 581 (E.D.Pa. 2005) (citing 42 Pa.C.S. § 5301(a)(2)).[15]

1.    Consent

PEIC alleges that AXA Belgium consented to jurisdiction because it was a foreign corporation qualified to do business in Pennsylvania. PEIC's argument regarding this alleged consent is a bit circuitous.

PEIC first notes that AXA issued insurance policies to insureds in Pennsylvania through a licensed surplus lines agent, M&C. According to PEIC, under Pennsylvania law, AXA Belgium could only have issued policies in Pennsylvania if it was a licensed insurer or an eligible surplus lines insurer. Because AXA Belgium claims it was never licensed, PEIC contends AXA Belgium must have been an eligible surplus lines insurer.[16] (Pl.'s Mem. 7-9.) PEIC contends that, in order to write business as an eligible surplus lines insurer, AXA Belgium had to be authorized by the Pennsylvania Insurance Commissioner. (Pl.'s Mem. 7-9 (citing 40 P.S. § 1006.7)) Thus, PEIC concludes that even if not licensed, AXA Belgium was a foreign corporation authorized to do

---

[15] 42 Pa. Cons. Stat. Ann. § 5301(2)(a) The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person . . .:
(2) Corporations.--
     (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
     (ii) Consent, to the extent authorized by the consent.
     (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

[16] Surplus lines refers to the placement of insurance risks located in Pennsylvania with insurers not licensed to transact business in Pennsylvania. Def.'s Reply Mem. 1, n. 1 (citing 40 P.S. § 1006.1 (1992)).

10

business in Pennsylvania, and thereby consented to general jurisdiction. (Pl.'s Mem. 9.) PEIC relies upon Bane v. Netlink, Inc., 925 F.2d 637, 641 (3d Cir. 1991) (citing Dehne v. Hillman Inv. Co., 110 F.2d 456, 458 (3d Cir. 1940)), which held that a defendant corporation's application and authorization for a certificate of authority to do business in Pennsylvania could be viewed as its consent to be sued in Pennsylvania under 42 Pa.C.S. § 5301(2)(a)(ii).

AXA Belgium acknowledges that it was an eligible surplus lines insurer from September 18, 1979 through August 29, 1991. (Def.'s Reply Mem. 1-2.) However, AXA notes that while surplus line agents must be licensed and are regulated by the Pennsylvania Insurance Commissioner, 40 P.S. § 1006.8, eligible service line insurers are not authorized, licensed or regulated by the Pennsylvania Insurance Commission, but rather, are "declared eligible" upon request. 40 P.S. § 1006.7.[17] Indeed, AXA Belgium points out that every surplus line policy must state that it was issued by an insurer "neither licensed by nor under the jurisdiction" of the Pennsylvania Insurance Department. 40 P.S. 1006.12.[18] (Def.'s Reply Mem. 1-3.)

---

[17] 40 P.S § 1006.7 reads: (a) No surplus lines agent shall place any insurance with any unlicensed insurer which is not then an eligible surplus lines insurer. No unlicensed insurer shall be or become an eligible surplus lines insurer unless declared eligible by the commissioner in accordance with the following conditions: (1) A licensed surplus lines agent must request the commissioner, in writing, to declare the particular unlicensed insurer eligible. Further: 40 P.S § 1006.7(d). Nothing in this section shall be deemed to impose on the commissioner any duty or responsibility to determine the actual financial condition or claims practices of any unlicensed insurer; and the status of being an eligible surplus lines insurer, if granted by the commissioner, shall be construed to mean only that the insurer appears to be sound financially and to have satisfactory claims practices, and that the commissioner has no credible evidence to the contrary. (emphasis added).

[18] Further, 40 PS 1006.13 mandates a service of suit clause in every surplus lines policy which conferred jurisdiction over the eligible surplus lines insurer. The clause was expressly limited to actions "arising out of the [surplus lines] insurance contracts." This does not establish consent to general jurisdiction and if general jurisdiction was created by surplus lines contracts, there would be no need for the provision.

11

I conclude that, unlike the defendant in Bane, AXA Belgium did not obtain, nor was it required to obtain authority to do business in the Commonwealth. AXA Belgium was "declared eligible" as a surplus line insurer, a process which, under 40 P.S. § 1006.7 does not rise to the level of authorization. AXA Belgium was not a foreign corporation authorized to do business in Pennsylvania and thus did not consent to jurisdiction in the Commonwealth.

2.    Continuous and Systematic Contacts

PEIC also posits that general jurisdiction is established through AXA Belgium's continuous and systematic contacts in Pennsylvania. In order to find "continuous and systematic" contacts, the level of a defendant's activity in the state must be "significantly more than mere minimum contacts." Provident Nat'l, 819 F.2d at 437. The general jurisdiction standard "demands contacts with the forum which approximate physical presence." Nationwide Contractor Audit Serv., Inc. v. Nat'l Compliance Mgmt. Serv., Inc., 622 F.Supp.2d 276, 284 (W.D.Pa. 2008).

Courts look to numerous factors to determine if there has been sufficient contact to confer general jurisdiction, including: (1) whether the defendant conducts daily business with Pennsylvania companies; (2) what percentage of defendant's total business was generated in Pennsylvania; (3) whether defendant maintained offices or paid taxes in Pennsylvania; (4) whether defendant availed itself of Pennsylvania resources in an extensive manner as a way of furthering its business; and (5) whether defendant made significant direct sales in Pennsylvania, solicited business regularly in Pennsylvania, and advertised in a manner specifically targeted to reach the Pennsylvania market. Henning v. Suarez Corp., 713 F.Supp.2d 459, 465 (E.D.Pa. 2010) (citations omitted).

While the amount of business conducted in the forum is a significant consideration, it is the "quality and nature" of the defendant's contacts that serves as the touchstone of general jurisdiction.

Manning v. Flannery, 2010 WL 55295, at *6 (E.D.Pa. Jan. 6, 2010) (citing Pennzoil, 149 F.3d at 203). As such, the court "should look to the party's 'purposeful and extensive availment of the forum'" and "consider the degree to which a corporation's contacts with a given forum are 'central to the conduct of its business.'" Henning, 713 F.Supp.2d at 465 (Provident Nat'l, 819 F.2d at 437-38).

By way of example, in Provident Nat'l, 819 F.2d at 437-38, the Third Circuit Court of Appeals agreed with the district court's extension of jurisdiction over a California bank that had only .066% of its depositors in Pennsylvania, received .071% of its deposits from Pennsylvanians, and extended only .083% of its outstanding loans to Pennsylvania residents. Despite the small percentage of business being conducted in the forum, the court found the defendant's contacts with the forum - the deposits and loans at issue - were the "bread and butter of [the defendant's] daily business" and therefore, due to the nature of the contact, defendant had a greater expectation of being haled into court. Id.

In finding jurisdiction, the Provident Nat'l court also focused on the defendant's zero-balance account with a Pennsylvania Bank, noting that the defendant conducted business regarding that account every business day. The court stressed that "this daily contact was a continuous and central part of [the defendant's] business" and "constituted a substantial, ongoing, and systematic activity in Pennsylvania." Id. at 438.

AXA Belgium contends that it has not had "continuous and systematic" contacts with Pennsylvania because it: does not own, rent, use or possess any property in Pennsylvania; does not have an office, place of business, postal address or telephone listing in Pennsylvania; is not licensed to do business in Pennsylvania (nor has it ever applied for such a license); does not advertise, sell.

solicit business, or contract to supply any goods or services in Pennsylvania; does not have any employees or agents in Pennsylvania; and does not maintain a bank account or own other property in Pennsylvania. (Def.'s Mem. 10.) I find these factors weigh against subjecting AXA Belgium to jurisdiction in Pennsylvania.

For the most part, PEIC does not directly dispute these factors but instead argues that general jurisdiction exists because AXA Belgium's contacts with Pennsylvania make up the "bread and butter" of its daily business. (Pl.'s Supp. Mem. 5.) Although AXA Belgium stopped writing insurance in the United States in 1991, PEIC argues that prior to 1991, AXA Belgium issued insurance policies to Pennsylvania insureds and entered into numerous reinsurance contracts with Pennsylvania insurance companies. PEIC explains that because these insurance policies and reinsurance contracts cover casualty risks, AXA Belgium's obligations are long term, ongoing and establish a substantial, continuing "core business" in the United States, and in turn, Pennsylvania. (Pl.'s Mem. 11.) Thus, according to PEIC, the "bread and butter" of AXA Belgium's business in the United States now consists "exclusively of activities arising out of the run off of its business, including the handling of inward claims under insurance policies and reinsurance contracts and the collection of outward reinsurance recoveries." (Pl.'s Mem. 12.)

AXA Belgium responds to this argument in several ways. First, AXA Belgium reiterates that it was never licensed as an insurer in Pennsylvania. AXA Belgium acknowledges that it was an eligible surplus line insurer from September 18, 1979 through August 29, 1991. However, it stresses that during that period, only a small portion of the policies were received by Pennsylvania insureds, and in any event, under Pennsylvania law, underwriting surplus lines policies is not "doing an insurance business." (Def.'s Resp. 4 (citing 40 P.S. § 46(e)(1); Depuis Supp. Aff. ¶ 3)). Similarly,

14

underwriting reinsurance contracts does not constitute "doing business" in Pennsylvania. (Def.'s Resp. 4 (citing 40 P.S. § 46(e)(3))).

While AXA acknowledges that it may have continuing obligations under the surplus lines and reinsurance contracts (run off obligations), AXA Belgium also asserts that any transaction in Pennsylvania arising out of those contracts "do not constitute doing an insurance business in Pennsylvania, and are thus irrelevant for jurisdictional purposes." (Def.'s Resp. 4-5 (citing 40 PS 46(e)(1), (3), (6)).

Lastly, AXA Belgium posits that its claim and reserve activity that may be connected to Pennsylvania over the past 10 years has been de minimus as compared to its overall claim and reserve activity and thus weighs in favor of dismissal. Examining its claim activity going back three years, AXA notes that there were only thirteen claims ($640,849); in the past five years there were only twenty-three claims ($1,670,804); and in the past seven years, only fifty-six claims ($5,043,244). (Def.'s Resp. to Pl's Supp. Mem. 8.)

In analyzing the parties' respective positions, I must first determine what the relevant time period is in deciding whether AXA Belgium has had continuous and systematic contacts with the forum. A "court must examine the contacts over a reasonable period of time to determine whether general jurisdiction existed when the action arose." Simplicity, 2006 WL 924993, at *2 (citing Modern Mailers, Inc. v. Johnson & Quin, Inc., 844 F.Supp. 1048, 1052 (E.D.Pa. 1994)). The Second Circuit Court of Appeals has observed that "[f]ew cases discuss explicitly the appropriate time period for assessing whether a defendant's contacts with the forum state are sufficiently 'continuous and systematic' for the purposes of general jurisdiction." Metropolitan Life Insurance Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569 (2d Cir. 1996). The court noted that defendant's contacts

with the forum are generally assessed over a period of years ranging from three to seven years prior to the filing of the complaint. Id. (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 409-11 (1984); Wilson v. Belin, 20 F.3d 644, 650-51 (5th Cir. 1994); Bearry v. Beech Aircraft Corp., 818 F.2d 370, 374 (5th Cir.1987); Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1329, 1330-31 (9th Cir. 1984)). According to the Second Circuit:

> [D]istrict courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances-up to and including the date the suit was filed-to assess whether they satisfy the "continuous and systematic" standard. The determination of what period is reasonable in the context of each case should be left to the court's discretion.

Metropolitan Life, 84 F.3d at 569.

PEIC has relied upon evidence of AXA Belgium's contacts with Pennsylvania as far back as 1977, including evidence that AXA Belgium entered into a number of reinsurance, insurance and retrocessional contracts between 1977 and 1991/1992. However, the alleged breach of contract at issue occurred much later, in 2007, while the complaint was filed in November 2009. Given the precedent cited above, I conclude that examining all of AXA Belgium's contacts with Pennsylvania between 1977 and November 2009 is an unreasonable time period. See Birnberg v. Milk St. Residential Associates Ltd. Partnership, 2002 WL 1162848, at *4 (N.D.Ill. 2002) ("the fact that the defendant may have had more significant contacts ten to fifteen years ago does not mean that the defendant is subject to the personal jurisdiction of the forum's courts")(citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 563, 62 L.Ed.2d 490 (1980). Keeping in mind that PEIC relocated to Pennsylvania in 1996, the more reasonable time period to

examine AXA Belgium's contacts is between 2000 and November 2009.[19]

Using this time frame, and after careful consideration of all of the factors highlighted by PEIC, I conclude that PEIC has not presented sufficient evidence of AXA Belgium's continuous and systematic contacts in Pennsylvania to establish a *prima facie* case of general jurisdiction. It is undisputed that AXA Belgium does not own, rent, use or possess any property in Pennsylvania; does not have an office, place of business, postal address or telephone listing in Pennsylvania; is not licensed to do business in Pennsylvania (nor has it ever applied for such a license); does not advertise, sell, solicit business, or contract to supply any goods or services in Pennsylvania; does not have any employees in Pennsylvania; and does not maintain a bank account or own other property in Pennsylvania.

Moreover, the 74 claim payments made over ten years, valued at approximately $7.5 million, comprised only .026% of AXA Belgium's total claim payments during that same time period. While the small percentage alone is not dispositive, these payments were not, as was the case in Provident Nat'l, accompanied by any other substantial and continuous contacts. As noted infra, in Provident Nat'l, the defendant conducted business in Pennsylvania on a daily basis through a Pennsylvania bank. Provident Nat'l, 819 F.2d at 438. Here, that type of daily, continuous activity does not exist. See also Manning, 2010 WL55295, at *8 (although defendant's contacts relate to its primary

---

[19] Additionally, the insurance and reinsurance contracts that AXA Belgium entered into prior to 1991 created long term obligations, and resulted in contacts and transactions occurring in Pennsylvania between 2000 and November of 2009. Contrary to AXA Belgium's position, I conclude that the contacts and transactions arising out of these obligations are relevant for jurisdictional purposes. I disagree with AXA Belgium's argument that because underwriting surplus line insurance policies and reinsurance contracts is not considered "doing business," the activity is necessarily rendered "irrelevant for jurisdictional purposes." (Def.'s Resp. Mem. 4). This activity would have been relevant had it occurred in the relevant time period, and therefore, the transactions arising from these contacts are also relevant.

17

business, the level of activity in this district is too insubstantial to establish continuous and systematic contacts.)

Even if I were to accept that AXA LM Inc. acted as AXA Belgium's agent, and that its activities are attributable to AXA Belgium, allegations of five audits, an unspecified number of in person meetings and "numerous" contacts over ten years are too vague to support a finding that contact was "continuous and substantial." See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 (3d Cir.1984) (holding that a plaintiff establishing personal jurisdiction must present more than "mere affidavits which parrot and do no more than restate plaintiff's allegations without identification of particular defendants and without factual content"); see also Assonov, 209 Fed.Appx. at 141.[20]

A plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction. Provident Nat'l, 819 F.2d at 437. The facts required to show general jurisdiction must be "extensive and persuasive." Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas, 675

---

[20] PEIC also relies upon Cent. States, Southeast & Southwest Areas Pension Fund v. Phencorp Reinsurance Co., 530 F.Supp.2d 1008 (N.D.Ill. 2008). There, the plaintiff filed a complaint against the defendant to recover payments allegedly owed to plaintiff by defendant's parent company, pursuant to the Employee Retirement Income Security Act ("ERISA"). Defendant, a reinsurance company organized under the laws of Barbados, filed a motion to dismiss for lack of personal jurisdiction. Id. at 1010. The question before the Court was whether the defendant had sufficient contacts with the United States. The court held that a reinsurer was subject to general jurisdiction based on run-off claim payments and obligations. However, the court reached this conclusion after finding that the defendant's agent managed defendant's business and day-to-day operations in the forum. The reinsurance agreements also provided that the agent undertake the duties of adjusting claims arising under the agreements and that the defendant would pay expenses associated with those activities. Further the defendant reinsurer had agreed to settle disputes under the contracts through arbitration in the U.S. and to jurisdiction in the U.S. and also designated an officer in the United States to accept service. Finally, the court found that the defendant's five contracts with United States entities had generated substantial income for defendant and created thousands of claims against the policies. Id. at 1019-1021. These facts are significantly stronger than those presented here by PEIC.

F.2d 587, 588-89 (3d Cir.1982). I find PEIC has failed to provide such persuasive facts and that the nature and extent of AXA Belgium's contacts with Pennsylvania are insufficient for this Court to assert general jurisdiction.

B.    Specific Jurisdiction

Specific jurisdiction exists where the plaintiff's cause of action arises out of the defendant's contact with the forum state such that the defendant "should reasonably anticipate being haled into court" in that forum. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In order for specific jurisdiction to be properly exercised under the Due Process Clause, the plaintiff must satisfy a two-part test. IMO Indus. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir.1998). First, the defendant must have constitutionally sufficient "minimum contacts" with the forum state. Id. (citing Burger King, 471 U.S. at 474). Second, the court must determine, in its discretion, that exercising jurisdiction would "comport with traditional notions of fair play and substantial justice." Id. (citing Vetrotex, 75 F.3d at 150-51).

To satisfy the first prong of the test, the defendant must have "purposefully directed" its activities at the forum. O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007). Parties who "reach out beyond [their] state and create continuing relationships and obligations with citizens of another state" are subject to the regulations of their activity in that undertaking. Burger King, 471 U.S. at 473. The "unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient. Hanson, 357 U.S. at 253.

In analyzing specific jurisdiction arising out of a breach of contract claim, the court should consider "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing." Remick, 238 F.3d